

1  Robert J. Nelson (CA 132797)
   rnelson@lchb.com
2  Nimish R. Desai (CA 244953)
   ndesai@lchb.com
3  Jerome Mayer-Cantú (CA 291623)
   jmayercantu@lchb.com
4  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   275 Battery Street, 29th Floor
5  San Francisco, CA  94111-3339
   Telephone:  415.956.1000
6  Facsimile:  415.956.1008

7  *Attorneys for Relator John Roe*

**FILED**

APR 15 2014

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES *ex rel.* JOHN ROE          Case No.

12              Plaintiffs,                    2:14 - CV - 0 9 1 7 LKK DAD

13  v.                                         **COMPLAINT**

14  ORTHOPEDIC ASSOCIATES OF                   False Claims Act, 31 U.S.C. § 3729, *et seq.*
    NORTHERN CALIFORNIA, A
15  MEDICAL GROUP;                             **DEMAND FOR JURY TRIAL**
    RENO ORTHOPEDIC CLINIC, DR.
16  CHRISTENSEN;                               **SEALED**
    SAN BERNARDINO MEDICAL
17  ORTHOPAEDIC GROUP, INC.;                   **FILED IN CAMERA AND UNDER SEAL**
    MICHAEL I. KELLER, M.D., INC. d/b/a        **PURSUANT TO 31 U.S.C. 3730**
18  SAN DIEGO ARTHRITIS MEDICAL
    CLINIC;  and
19  DOES 1-20,

20              Defendants.

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | JURISDICTION | 2 |
| III. | PARTIES | 3 |
| IV. | BACKGROUND AND REGULATORY FRAMEWORK | 4 |
|  | A. Viscosupplements are used to treat osteoarthritic knee pain and are closely regulated by the Food and Drug Administration. | 4 |
|  | B. Government healthcare programs reimburse providers for their purchase and use of viscosupplements. | 6 |
| V. | FACTUAL ALLEGATIONS | 8 |
|  | A. Reimported viscosupplements pose serious safety risks to patients. | 8 |
|  | B. Providers increase their profits by purchasing illegal, reimported viscosupplements, which are far cheaper than legal, domestic product. | 9 |
|  | C. Clinics in Relator's sales territory have admitted to purchasing reimported viscosupplements. | 10 |
|  | D. Relator's sales colleagues have confirmed that other clinics throughout the country are using reimported viscosupplements. | 14 |
|  | E. The Doe defendants are easily identified because viscosupplement manufacturers track reimporting providers. | 15 |
|  | F. Claims for reimbursement of reimported viscosupplements are false or fraudulent in violation of the state and federal False Claims Act statutes. | 16 |
| VI. | CAUSES OF ACTION | 17 |
| VII. | PRAYER FOR RELIEF | 21 |

**I.    INTRODUCTION**

1.     Plaintiff and Relator John Roe, by and through his attorneys, brings this action on behalf of the United States of America and state governments, pursuant to the *qui tam* provision of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), and analogous state statutes ("State *qui tam* statutes" or "*Qui Tam* States").

2.     This is an action to recover damages and civil penalties on behalf of the United States and the *Qui Tam* States, arising from false and/or fraudulent records, statements and claims made, used, and presented, and caused to be made, used, or presented by Defendants and/or their agents, employees and co-conspirators under the False Claims Act and the State *qui tam* statutes.

3.     This action arises from the long-standing, pervasive, and dangerous practice of medical providers billing government health care programs for viscosupplements that are reimported, *i.e.*, shipped from the United States for distribution abroad, and then illegally shipped back into the United States by black market distributors and sold at deep discounts. Reimported viscosupplements are dangerous and illegal, and are therefore ineligible for reimbursement by government health care programs.

4.     Viscosupplements are doses of hyaluronic acid injected into the knee to provide short- and medium-term relief to osteoarthritic knee pain. Medical providers obtain reimported product far cheaper than its FDA-approved, domestically-sold counterpart. Because government health care programs reimburse claims for viscosupplements based on the significantly higher domestic prices, providers pocket these savings as profit.

5.     Use of reimported products is dangerous, because they are not subject to regulatory oversight by the Food and Drug Administration (FDA). It is impossible to know what is actually being purchased, be it an actual viscosupplement that meets all domestic rules and regulations, adulterated product, or even a placebo. Reimported viscosupplements are subject to tampering, dilution, modification, and spoliation during largely undocumented periods abroad, making them potentially very harmful to patients.

6.     Reimported viscosupplements are not only dangerous, but illegal. They are, by definition, adulterated and misbranded because they necessarily fail to meet the strict packaging

1   and product labeling requirements FDA requires of all medical devices. *See* Federal Food, Drug,

2   and Cosmetic Act (FDCA), 21 U.S.C. §§ 301, 351 (adulterated product), 352 (misbranded

3   product).

4          7.      Because the sale and use of reimported viscosupplements is unlawful, claims for

5   reimbursement of the product to government health care programs are false and fraudulent in

6   violation of the FCA and State *qui tam* statutes. These programs will not pay for products that are

7   in violation of FDA labeling, branding, and adulteration laws and regulations, and whose safety

8   and integrity cannot be verified due to their reimportation.

9          8.      Relator came to know of this pervasive problem through his eight years as a sales

10   representative for a viscosupplements manufacturer, continuing today. In addition to identifying

11   clinics in his sales territory that reimport product, Relator also learned of clinics throughout the

12   country engaged in the same conduct, based on conversations and communications with sales

13   colleagues and management. Relator has also become familiar with his company's efforts at

14   identifying reimporting providers, including an online reporting system and company-directed

15   communications to providers strongly suspected of using reimported product.

16   **II.    JURISDICTION**

17         9.      This Court has jurisdiction over the subject matter of this action pursuant to

18   28 U.S.C. § 1331, 31 U.S.C. § 3732, and 28 U.S.C. § 1367(a).

19         10.     This Court has personal jurisdiction over Defendants, because Defendants have

20   systematically, continuously, and purposefully availed themselves of the privilege of doing

21   business in California and in this District, and because Defendants' acts giving rise to the

22   violations alleged occurred in California and in this District. This Court also has personal

23   jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny

24   action under section 3730 may be brought in any judicial district in which the defendant, or in the

25   case of multiple defendants, any one defendant can be found, resides, transacts business or in

26   which any act proscribed by section 3729 occurred." During the relevant period, at least one of

27   Defendants resided in and transacted business in the Eastern District of California.

28         11.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C.

1   § 1391(b) because at least one Defendant can be found in, resides in, and transacts business in the

2   Eastern District of California, because a substantial part of the events or omissions which give

3   rise to the claims alleged herein occurred in this District, and because at least one Defendant is

4   subject to this Court's personal jurisdiction with respect to this action.

5   **III.   PARTIES**

6        12.    John Roe is a fictitious name for the Relator and Plaintiff, who is a sales

7   representative for a manufacturer of a popular viscosupplement product. Relator began his career

8   in viscosupplement sales in January 2006, and continues to manage the same territory to this day.

9        13.    Defendant Orthopedic Associates of Northern California, A Medical Group

10   ("OANC"), is a California corporation that operates orthopedic clinics in Chico, California. Its

11   principal place of business is in Chico, California.

12        14.    Defendant Reno Orthopedic Clinic, Dr. Christensen ("ROC"), is a domestic

13   professional corporation under the laws of Nevada that operates orthopedic clinics in Reno,

14   Winnemucca, Fallon, and Elko, Nevada. Its principal place of business is in Reno, Nevada.

15        15.    Defendant San Bernardino Medical Orthopaedic Group, Inc., is a California

16   corporation that operates orthopedic clinics throughout the Inland Empire region of Southern

17   California, including Redlands, Riverside, Lake Arrowhead, Hemet, Rancho Cucamonga, and

18   San Bernardino. Its principal place of business is in San Bernardino County, California.

19        16.    Defendant Michael I. Keller, M.D., Inc. d/b/a San Diego Arthritis Medical Clinic

20   is a California corporation that operates orthopedic clinics in San Diego, Chula Vista, Poway, and

21   El Centro, California, and in Yuma, Arizona. Its principal place of business is in San Diego,

22   California.

23        17.    Doe Defendants 1-20 are medical providers throughout the country who have

24   purchased, used, and billed government programs for reimported viscosupplements, and thereby

25   knowingly violated federal laws and regulations, and threatened their patients' safety. As

26   discussed below, these entities are easily identified by lists of suspected reimporters maintained

27   by the manufacturers, sales data maintained by the manufacturers, and government health care

28   programs' claims paid data.

## IV.   BACKGROUND AND REGULATORY FRAMEWORK

### A.   Viscosupplements are used to treat osteoarthritic knee pain and are closely regulated by the Food and Drug Administration.

18.    Viscosupplements are a synthetic form of hyaluronic acid.  Hyaluronic acid is a naturally occurring substance found in the synovial (joint) fluid.  It acts as a lubricant to enable bones to move smoothly over each other and as a shock absorber for joint loads.

19.    People with osteoarthritis have low concentrations of hyaluronic acid in their joints.  One treatment option for patients with osteoarthritic knee pain is to have a physician inject viscosupplements into the knee joint.

20.    The most common brands of viscosupplements are Synvisc and Synvisc One, marketed by Sanofi Aventis; Hyalgan, marketed by Italian company Fidia Farmaceutici S.p.A.; Orthovisc, marketed by DePuy; Supartz, marketed by Smith & Nephew; and Euflexxa marketed by Ferring Pharmaceuticals.

21.    Viscosupplements are approved by the Food and Drug Administration (FDA) as injectable Class III medical devices to treat osteoarthritic knee pain.  As defined in the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. 301, *et seq*., Class III medical devices present "a potential unreasonable risk of illness or injury." 21 U.S.C. § 360c(a)(1)(C)(ii)(II).

22.    Before a Class III device may be introduced into the market, a manufacturer must obtain a "premarket approval" ("PMA") from FDA, the most detailed type of device marketing application under the FDCA.  21 U.S.C. 360c(a)(1)(C), 360e(a).  To obtain a PMA, the manufacturer must submit information to FDA that provides reasonable assurance that the device is safe and effective for its intended use.  21 U.S.C. 360c(a)(1)(C), 360e(a), (c), and (d).

23.    Each premarket submission must also include all proposed "labeling" for the medical device and its intended use.  When the FDA approves a premarket application, the FDA finds that based on the information supplied by the manufacturer, a device is safe and effective under the specific and limited conditions of use included on the label and that the label is not false or misleading.  21 U.S.C. § 360e(d)(1)(A), (d)(2).

24.    The FDCA also establishes a series of ongoing, post-approval requirements

1    regarding the labeling and quality of the product, including laws and regulations against
2    adulterated and mislabeled or misbranded product.

3        25.    A reimported viscosupplement is by definition "adulterated" within the meaning of
4    21 U.S.C. § 351(h), because the "methods used in, or the facilities or controls used for, its
5    manufacture, packing, storage, or installation are not in conformity with applicable requirements
6    under section 520(f)(1) [21 USCS § 360j(f)(1)] or an applicable condition prescribed by an order
7    under section 520(f)(2) [21 USCS § 360j(f)(2)]."

8        26.    Reimported viscosupplements are also mislabeled and misbranded.  Reimported
9    viscosupplements are intended for sale and distribution in foreign countries with their own
10   regulatory requirements.  These products are therefore shipped without FDA-required labeling,
11   and are therefore ineligible for sale or distribution in the United States, or for reimbursement by
12   government programs.

13       27.    Foreign labeling may in fact indicate the product for uses that are not approved by
14   the FDA.  For example, Synvisc is approved in Canada for use in the hip joint, a use which has
15   not been approved by FDA.

16       28.    To the extent reimported viscosupplements have FDA labeling, it is likely because
17   the black market distributors tampered with the product to replace the foreign labeling with FDA
18   labeling.  This tampering renders the product mislabeled and misbranded under the FDCA, and
19   raises even greater concerns about product integrity.

20       29.    A reimported viscosupplement is by definition "misbranded" pursuant to 21
21   U.S.C. § 352 because:

22           a.    its "labeling is false or misleading in any particular...."  § 352(a);

23           b.    the label fails to include "the name and place of business of the
24   manufacturer, packer, or distributor..." § 352(b); or

25           c.    " a notice or other information respecting it was not provided as required
26   by such section or section 510(k) [21 U.S.C. § 360(k)]," which in turn requires any person who
27   "proposes to begin the introduction or delivery for introduction into interstate commerce for
28   commercial distribution of a device intended for human use" to comply with certain reporting

1   requirements to the FDA regarding registration and product identity. § 352(o).

2       30.     Reimportation of viscosupplements with a foreign country's labeling, or after

3   replacing the non-United States labeling with a photocopy of the FDA label, is also unlawful

4   under the implementing regulations of the Federal Food, Drug, and Cosmetic Act. *See, e.g.*, 21

5   C.F.R. § 801.15(c)(1) (requiring labeling to be in English); *id.* § 801.109(b) (labels lack federal

6   caution statement for prescription devices); *id.* § 801.109(d) (labeling lacks required product

7   description, indications for use, contraindications, warning, precautions, and patient disclosure

8   information).

9   **B.    Government healthcare programs reimburse providers for their purchase**
        **and use of viscosupplements.**

10

11      31.     Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, establishes the

    Health Insurance for the Aged and Disabled Program, known as Medicare.
12

13      32.     Medicare Part B is a federally subsidized insurance program that covers certain

    non-hospital medical services and products, including the treatments at issue in this complaint.
14

15  42 U.S.C. §§ 1395(k), 1395(i), 1395(s).

16      33.     Medicaid is a joint federal/state program that provides care for indigent and

    disabled people. Although the Medicaid program is administered by the states, it is funded in
17

    significant part by the federal government.
18

19      34.     TRICARE, f/k/a CHAMPUS (The Civilian Health and Medical Program of the

    Uniformed Services), is a government-funded program that provides medical benefits to retired
20

21  members of the Uniformed Services and to spouses and children of active duty, retired, and

    deceased members, as well as reservists who were ordered to active duty for thirty (30) days or
22

    longer.
23

24      35.     Physicians and institutional providers submit requests for reimbursement to

    government programs using standardized claim forms. These claim forms include medical
25

    coding that identifies drugs, devices, and supplies provided to the patient, as well as procedures
26

    performed on the patient.
27

28      36.     Claims to government programs for viscosupplements are easily identified based

1  on the Healthcare Common Procedure Coding System (HCPCS) codes on the claim forms,

2  because each viscosupplement product is billed under a unique HCPCS code.

3          a.     Hyalgen, marketed by Italian company Fidia Farmaceutici S.p.A., and

4  Supartz, marketed by Smith & Nephew, are billed under HCPCS code J7321.

5          b.     Euflexxa, marketed by Ferring Pharmaceuticals, is billed under HCPCS

6  code J7323.

7          c.     Orthovisc, marketed by DePuy, is billed under HCPCS code J7324.

8          d.     Synvisc, marketed by Sanofi Aventis, was previously billed under HCPCS

9  code J7322. Following approval of Synvisc-One in 2009, both products are billed under HCPCS

10  code J7325.

11      37.    Medicare reimbursement for drugs and biologics administered in the physician's

12  office, like viscosupplements, is based on the average sales price ("ASP"). For single-source

13  drugs like the viscosupplement products identified in the prior paragraph, the ASP is defined as

14  the weighted average of sales of the product's NDCs across all channels (*e.g.*, retail, hospital, and

15  clinic). Volume discounts, prompt pay discounts, cash discounts, charge-backs, and rebates are

16  all taken into account in the calculation of a product's ASP. Medicare determines an ASP

17  payment per billing unit of the product's HCPCS code.

18      38.    Viscosupplementation agents are reimbursed using a blended, multiple-source

19  ASP formula. This means that the ASP-based allowable per HCPCS billing code for that product

20  will depend on the respective products' ASP amounts, as well as the number of units of each code

21  sold during the quarter.

22      39.    The Medicare allowable payment for viscosupplementation agents is ASP + 6%

23  and is updated quarterly, based on sales in previous quarters. Medicare reimburses 80% of the

24  allowed payment amount, and the patient or patient's secondary insurer/supplemental plan is

25  responsible for remaining 20%.

26      40.    Medicare also provides reimbursement for the administration of

27  viscosupplementation agents through the Current Procedural Terminology (CPT) code 20610 for

28  arthrocentesis. Physicians receive 150% of the payment amount for CPT Code 20610. Medicare

1 | reimburses 80% of the allowed payment amount, and the patient or patient's secondary

2 | insurer/supplemental plan is responsible for remaining 20%.

3 |     41.    Reimbursement under other federal health care programs, like CHAMPUS and

4 | TRICARE, generally track Medicare reimbursement policies.

5 |     42.    Medicaid payment policies vary by state, but the Medicaid payment policies for

6 | viscosupplement agent administration and associated office visits typically are similar to those

7 | under Medicare, with reimbursement structured according to a physician fee schedule.

8 | **V.    FACTUAL ALLEGATIONS**

9 |     **A.    Reimported viscosupplements pose serious safety risks to patients.**

10 |     43.    Reimported product poses a series of related safety risks to patients.

11 | Manufacturers refuse to stand by reimported viscosupplements because product intended for

12 | foreign markets would not have been shipped in compliance with FDA labeling requirements, and

13 | because there is no way to know whether reimported product continues to meet quality and safety

14 | requirements.

15 |     44.    As one manufacturer explains in a 2009 sales aid, "Reimportation compromises

16 | the safety and quality of products." The flyer identifies four serious risks associated with

17 | reimported product. First, the product may have been "tampered with," in that the "products and

18 | packaging may have been altered." Second, it could have been "stored improperly." "[E]xtreme

19 | conditions, such as very hot or cold air, in different geographic regions can change the chemistry,

20 | effectiveness, and integrity of a product." Third, the product could be expired. "[T]he dates

21 | appear valid but may have been altered to conceal an expired product." Fourth, the product could

22 | be an outright counterfeit. "[S]ome products are replaced with imitations, which can pose

23 | dangerous health risks to patients."

24 |     45.    The same manufacturer reiterated many of those points in a 2010 FAQ on

25 | reimportation. "Once our product has been sold to our established vendors outside of the U.S.,

26 | we lose control of our ability to track the product and assure that it has been handled properly to

27 | ensure its integrity. We have no way of ensuring that any of the product that is being provided by

28 | these reimporters has been handled using [our] approved rigourous, distribution, handling, and

1  storage methods. Therefore, the product being offered by these reimporters may be unsafe or
2  ineffective because it is unknown how the product was packaged, shipped and stored on its way
3  back into the U.S."

4      46.    These same FAQs also warn that if its viscosupplement product is "being sold via
5  the internet or by distributors that are not [] wholesale partners it is not product that complies with
6  U.S. labeling requirements." Because product sold internationally is packaged by the
7  manufacturer with different labeling, if any reimported product "contains FDA-approved
8  labeling, the product has been purchased outside the U.S., possibly tampered with, and illegally
9  packaged."

10     47.    In another sales aid, the Reimportation Case Study Detail, the Relator's employer
11 described a real life case study in which the viscosupplement product was sold to a reimportation
12 shell company disguised as a distributor in Germany, stored in Hong Kong, shipped through the
13 United Arab Emirates and the United Kingdom on its way to a warehouse in the Bahamas, and
14 then sold to a United States provider from a website falsely representing it was selling product
15 from Canada.

16     48.    Manufacturers issue similar warnings on their websites: "Please be aware that the
17 US Food and Drug Administration has clearly stated that virtually all drugs imported to the
18 United States from Canada and any other foreign country would violate US law. Moreover, the
19 US Department of Justice has indicated, in reporting on its own activities, that billing Medicare
20 for drugs imported from a foreign company has been determined to be a violation of federal law,
21 including the Federal False Claims Act." *See* Ordering Euflexxa, available at
22 http://www.euflexxa.com/physician/ordering-euflexxa (last visited March 31, 2014).

23     **B.**     **Providers increase their profits by purchasing illegal, reimported**
               **viscosupplements, which are far cheaper than legal, domestic product.**
24
25     49.    Despite its illegality and danger, providers, such as Defendants, still routinely
   purchase and use reimported viscosupplements. They are motivated by the profits they can gain
26
   by gaming the system.
27
28     50.    Medicare Part B reimburses viscosupplements under the "buy and bill" model,

1   meaning that the provider first buys the viscosupplement product with its own funds, and is

2   reimbursed by the government when the product is used on a Medicare enrollee. In that regard,

3   viscosupplements are very different from pharmaceuticals, which a doctor prescribes but never

4   pays for or sells directly to patients.

5       51.   The Medicare allowable for Relator's company's product is approximately $600,

6   which again is based on lawful, domestic average sales prices. Under this system, lawful

7   purchasers of domestic product will be reimbursed a reasonable amount that comfortably covers

8   their cost of the viscosupplement.

9       52.   However, providers that use reimported product buy it for much cheaper than

10  FDA-approved, domestically-sold product. The price difference can equal hundreds of dollars

11  per viscosupplement kit. For example, reimporters have been known to sell reimported versions

12  of Relator's company's viscosupplement for $350, and perhaps lower. These illicit sales do not,

13  of course, factor into the Medicare reimbursement rate.

14      53.   Because the viscosupplement reimbursement is based on lawful, domestic sales, as

15  described above, clinics that purchase reimported product make hundreds of dollars more per

16  procedure than providers who comply with the law. These reimporting providers do not pass on

17  their savings to the patient or Medicare. Instead, they recklessly disregard federal law and patient

18  safety in order to increase their own profits.

19      54.   Providers also request separate reimbursement for the physician's professional

20  service in administering the viscosupplement. In the case of reimported product, government

21  programs are effectively paying the provider to administer illegal and potentially dangerous

22  product, in violation of the FDCA, the FCA, and the State *qui tam* statutes.

23      C.   **Clinics in Relator's sales territory have admitted to purchasing reimported**
         **viscosupplements.**
24
25      55.   Relator has firsthand knowledge of medical providers purchasing and using

26  reimported viscosupplements based on his eight years as a sales representative for a major

27  manufacturer, a role he began in January 2006.

28      56.   As part of Relator's training in 2006, his manager, who previously held Relator's

1  job, advised him that a major potential customer in his territory, Defendant Reno Orthopedic

2  Clinic (ROC), was reimporting product. ROC employs approximately twenty physicians at six

3  locations.

4       57.  Relator estimates that ROC treats 1,000 patients with viscosupplements annually,

5  and that half or more of these patients are enrollees of government health insurance programs,

6  including Medicare and Medicaid. ROC regularly bills government health insurance programs

7  for viscosupplement treatements provided to enrollees of the programs.

8       58.  Relator's manager knew about ROC's reimportation practices because of its

9  purchasing history. ROC had a long record of purchasing directly from Relator's company.

10  These purchases were reflected in the company's records, which recorded virtually all lawful

11  domestic purchases, whether direct or through approved distributors. According to his manager,

12  ROC's purchases stopped abruptly prior to Relator starting his position.

13       59.  Once he started his position, Relator reached out to ROC to discuss the clinic's

14  needs. ROC's staff and administrators confirmed that they continued to use Relator's company's

15  products, even though the company's records showed no lawful purchases. The only explanation

16  was that ROC was obtaining the product illegally through a reimporter.

17       60.  Later in 2006 or early 2007, Relator's company hosted a professional event at a

18  restaurant in Reno, Nevada, during which a speaker promoted the company's products, including

19  viscosupplements. At the end of the speaker's presentation, he discussed the dangers and

20  illegality of reimportation. ROC doctors were in attendance at the meeting.

21       61.  Over the past five years, Relator has regularly attended annual meetings of the

22  Nevada Orthopaedic Society. Physicians in Relator's sales territory, including ROC physicians,

23  also regularly attend the annual meeting. At more than one meeting, Relator has directly

24  confronted ROC physicians about reimporting from illegal distributors and the danger it poses to

25  patients.

26       62.  One such discussion took place at the 2011 annual meeting in Las Vegas. Relator

27  spoke directly to Drs. Boyden and Bray about reimportation. The doctors were evasive, and told

28  Relator to raise the issue with the clinic manager. Every time Relator did so, however, the

1    manager was not receptive.

2        63.    ROC organized its own conference for family physicians in 2011. Relator

3    attended as a vendor and set up a booth at the conference. Once again, Relator spoke to Drs.

4    Boyden, Bray, and Uppal about why they should cease purchasing reimported product from

5    unauthorized distributors, only to be rebuffed again and directed to the non-receptive clinic

6    manager.

7        64.    At this same ROC-sponsored conference, ROC physicians giving a presentation

8    confirmed that they used the Relator's company's viscosupplements. Yet, other than a handful of

9    purchases in 2009, the company's data showed no lawful purchases by ROC since before 2006.

10        65.    Relator and his supervisor traveled to ROC's offices late in the summer of 2011 to

11    discuss the problem of reimportation. Relator made note of the lot numbers of his company's

12    product in ROC's storage. Relator and his manager provided the lot numbers to colleagues at

13    their company who could track the lots' shipment history. The shipment history revealed that

14    ROC's product had initially been shipped to the United Kingdom, France, and Italy.

15        66.    Relator and his manager logged their concerns in their company's Reimportation

16    Tracker on September 2, 2011. They conservatively estimated that ROC possessed thirty

17    reimported kits at that time.

18        67.    On September 9, 2011, ROC's Clinical Services Manager sent an inquiry to

19    Relator's company, admitting that "our product is coming from Europe and Canada," and asking

20    if the company would stand by the product despite its reimported status.

21        68.    The company responded that while the product shipped internationally was

22    technically the same as domestic product at the time it was shipped, "resale in the United States

23    does not comply with US law in that it does not meet FDA [] labeling requirements," and that the

24    company "cannot ensure...the safety and quality of [the product] re-imported into the US through

25    unauthorized distribution channels."

26        69.    Nevertheless, in emails over October and November of 2011, ROC reiterated that

27    it did not intend to change its purchasing habits unless Relator's company could offer the product

28    closer to the lower prices of reimported product, to which ROC had grown accustomed.

1    70.    To Relator's knowledge, ROC's purchasing habits have not since changed. His

2    company's sales data still reflects no legal purchases, though Relator is informed and believes

3    based on communications with ROC employees, including the clinical manager, that ROC

4    continues to use his company's viscosupplement product.

5    71.    Relator's experience with ROC is not unique. Another provider with a long

6    history of reimportation is Defendant Orthopedic Associates of Northern California (OANC),

7    based in Chico, California. Relator conservatively estimates that OANC treats hundreds of

8    patients with viscosupplements annually, and that half or more of their patients are enrollees of

9    government health insurance programs, including Medicare and Medicaid. OANC regularly bills

10   government health insurance programs for viscosupplement treatements provided to enrollees of

11   the programs.

12   72.    After starting his position in 2006, Relator reached out to OANC to discuss the

13   clinic's needs, and in conversations with clinic staff and administrators, learned that the clinic

14   continued to use the Relator's company's products, even though the company's records showed

15   no lawful purchases of those products.

16   73.    In approximately 2011, one of Relator's colleagues scheduled a lunch in Chico,

17   Califorina with an OANC physician and Relator. At that lunch meeting, Relator confronted the

18   physician about the clinic's reimporting and discussed the risks and illegality of the practice.

19   74.    In the fall of 2013, after hiring an additional administrator who was adamantly

20   opposed to reimportation, OANC began purchasing directly from Relator's company. Thus, for a

21   period of seven years or more, OANC wilfully and knowingly purchased reimported

22   viscosupplements and billed government programs for it.

23   75.    Other smaller clinics are also guilty of the practice. In his time at the company,

24   Relator has suspected, and often confronted, clinics in El Dorado, Shasta County, Lodi, and Yuba

25   City, all in California. Some clinics correct their practices after being confronted, but many, like

26   OANC and ROC, do not. Still others will purchase viscosupplements lawfully for a period, only

27   to revert to reimported product later.

28

**D.** **Relator's sales colleagues have confirmed that other clinics throughout the country are using reimported viscosupplements.**

76.     In meetings, emails, and conversations with sales colleagues in his region and nationally, Relator has learned that clinics throughout the country illegally purchase reimported product in order to increase their profits, at the expense of patient safety.

77.     Relator's employer, the manufacturer of a leading viscosupplement product, has 135 sales representatives responsible for viscosupplement and other biosurgery product sales throughout the United States.

78.     Relator meets regularly with the managers and representatives in his region to discuss sales updates and strategies. At these meetings, reimportation is a frequent agenda item. Representatives often have difficulty meeting their sales targets due to the prevalence of reimportation in their districts. Relator himself must often account for reimporting providers in discussing sales targets with his managers.

79.     For example, following the company's concerted push against reimportation in the fall of 2013, Relator reached out to colleagues in Southern California to see if they had success with converting accounts.

80.     In a conversation with one representative in February 2014, Relator learned that Defendant San Bernardino Medical Orthopaedic Group, Inc., had long been a reimporter, and that it was continuing that practice despite efforts by the representative to convert it to a lawful purchaser. In that conversation, Relator's colleague estimated that Defendant treated over 1,000 viscosupplement patients a year. Relator estimates based on his experience in the industry that half or more of these patients were enrollees of government health insurance programs.

81.     Likewise, Relator spoke to the representative in charge of Defendant Michael I. Keller, M.D., Inc. d/b/a San Diego Arthritis Medical Clinic. Relator learned that the Defendant had long been a reimporter, and that it was continuing that practice despite efforts by the representative to convert it to a lawful purchaser. Defendant regularly bills government health insurance programs for viscosupplement treatements provided to enrollees of the programs.

82.     The fact of reimportation also comes up through communications between

1     managers and representatives in Relator's region.  In an October 2012 email from Relator's

2     manager to sales representatives seeking sales updates, the manager's attached list of accounts

3     showed a dramatic drop in sales from "Merced Med Ortho" due to the fact that it was reimporting

4     product.

5         83.    Relator's company also holds national sales meetings for the sales representatives

6     in charge of biosurgery products, which includes viscosupplements.  During the most recent

7     national meeting in March 2014, Relator had a conversation with a Texas-based sales

8     representative who complained to Relator that one of her major accounts was reimporting the

9     company's viscosupplement product, and stressed that reimportation was a big problem

10    throughout Texas.

11        **E.**    **The Doe defendants are easily identified because viscosupplement**
                  **manufacturers track reimporting providers.**

12

13         84.    Because of the pervasiveness of the reimportation problem, manufacturers must

14    dedicate substantial resources to tracking and deterring the conduct, but without alienating

15    doctors who prescribe their products.

16         85.    Viscosupplement manufacturers and their sales representatives, who have firsthand

17    knowledge of providers' usage and purchase patterns, are highly incentivized to identify

18    providers that use reimported product, because converting these providers to lawful purchasers

19    increases the manufacturers' revenues and direct sales, and helps prevent the risk of patients

20    being harmed by reimported product.  As a result, manufacturer lists of suspected reimporters are

21    highly reliable.

22         86.    For example, Relator's company maintains a Reimported Product Tracker, which

23    allows representatives to track lot numbers to determine their origin, and to identify the provider

24    in possession of the suspected lots.  Relator used this product tracker to report suspected

25    reimported lots at Defendant ROC, as described above.

26         87.    Based on conversations with his sales colleagues and managers, Relator is

27    informed and believes that sales representatives have regularly submitted reports of suspected

28    reimporting clinics through the Reimported Product Tracker.

1    88.    The company also prepares and directly distributes a Reimportation Packet, which

2    compiles information from trade groups and government sources regarding reimportation,

3    including summaries of federal prosecutions related to the practice. If a clinic requests

4    information about reimportation, or agrees to accept information about reimportation, sales

5    representatives notify the company, which directly sends the packet to providers. Because of the

6    pervasiveness of the reimportation problem, the company actively encourages representatives to

7    make use of the Reimportation Packet.

8    89.    Further, with minor exceptions, manufacturers possess extensive data on all lawful

9    domestic purchases, enabling them to verify whether a particular provider is using reimported

10   product, just as Relator did with Defendants ROC and OANC. Government claims paid data can

11   be used to conduct this same analysis as to the Doe Defendants. A provider that is obtaining

12   reimbursement for viscosupplements, but shows no record of lawful purchases, is very likely a

13   reimporter.

14   90.    These extensive and costly efforts belie the seriousness and pervasiveness of the

15   reimportation problem. As noted above, Relator's company also prepares detailing pieces, such

16   as the flyer, FAQ, and case study described above in section V.A, for sales representatives to use

17   in their efforts to deter purchase of reimported product.

18   F.    **Claims for reimbursement of reimported viscosupplements are false or**
19         **fraudulent in violation of the state and federal False Claims Act statutes.**

20   91.    Reimported viscosupplements are adulterated within the meaning of 21 U.S.C.

21   § 351. They fail to meet federal requirements for "manufacture, packing, storage, or installation"

22   because they are packaged and labeled for international, and not domestic, sales, and are shipped

23   and stored abroad in unknown and undocumented conditions for unknown durations before being

     reimported to the United States for use on enrollees of government health programs.
24

25   92.    Reimported viscosupplements are misbranded within the meaning of 21 U.S.C.

26   § 352, as they fail to meet the labeling, product identification, and licensing requirements

27   identified in that section and the implementing regulations, as summarized in section IV.A.,

     above.
28

93.   Reimported viscosupplements are ineligible for reimbursement by government health care programs, including Medicare and Medicaid, because they are adulterated and/or misbranded within the meaning of the FDCA.

94.   As described above, Defendants knowingly submitted false and fraudulent claims to government health programs by purchasing and using reimported viscosupplements on their patients, but submitting claims as if the viscosupplements were lawfully obtained from the manufacturer or authorized distributor.

95.   Defendants created false and fraudulent records to support their false claims by noting in patient files that the patients were being treated with legal, domestic viscosupplements, and not reimported viscosupplements.

96.   By billing government programs for adulterated and/or misbranded viscosupplements, and by separately billing for the administration of that illegal product, Defendants submitted claims that they knew were ineligible for reimbursement, and also made, used, or caused to be made or used, false records or statements material to false or fraudulent claims.

97.   Government programs reimbursed Defendants for the false claims, and as a result have incurred and continue to incur significant damages due to Defendants' misconduct.

98.   Had the government programs known that they were being billed for illegal reimported viscosupplements, the programs would not have authorized reimbursement of the claims.

99.   Further, because Defendants have been reimbursed for illegal, reimported product based on the average sale price (ASP), yet buy the unregulated reimported viscosupplements at significantly lower prices, Defendants have fraudulently obtained a windfall profit.

## VI.   CAUSES OF ACTION

### COUNT I

### False Claims Act, 31 U.S.C. § 3729, *et seq.*

100.   Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

1       101.    This is a civil action brought by Relator, on behalf of the United States of America

2   against Defendants under the False Claims Act, 31 U.S.C. §3730(b)(1).

3       102.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

4   the information involved, or with actual knowledge of the falsity of the information, presented or

5   caused to be presented, and may still be presenting or causing to be presented false or fraudulent

6   claims for payment or approval under the Medicare, Medicaid, and other United States

7   Government health programs to officers, employees, or agents of the United States Government,

8   in violation of 31 U.S.C. § 3729(a)(1)(A).

9       103.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

10  the information involved, or with actual knowledge of the falsity of the information, made, used,

11  or caused to be made or used, and may still be making, using or causing to be made or used, false

12  or fraudulent records and/or statements to get false or fraudulent claims paid under the Medicare,

13  Medicaid, and other United States Government health programs in violation of 31 U.S.C.

14  § 3729(a)(1)(B).

15      104.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

16  the information involved, or with actual knowledge of the falsity of the information, made, used,

17  or caused to be made or used, and may still be making, using, or causing to be made or used, false

18  records or statements material to obligations to pay or transmit money or property to the

19  Government under the Medicare, Medicaid, and other United States Government health

20  programs, in violation of 31 U.S.C. § 3729(a)(1)(G).

21      105.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

22  the information involved, or with actual knowledge of the falsity of the information, concealed or

23  improperly avoided or decreased, and may still be concealing or improperly avoiding or

24  decreasing, obligations to pay or transmit money or property to the United States Government

25  under the Medicare, Medicaid, and other United States Government health programs, in violation

26  of 31 U.S.C. § 3729(a)(1)(G).

27      106.    The United States, unaware of the falsity of the claims and/or statements made or

28  caused to be made by Defendants, and in reliance on the accuracy of these claims and/or

1   statements, paid, and may continue to pay, for medical devices and device-related management

2   services for recipients of United States-funded health insurance programs.

3       107.   As a result of Defendants' actions as set forth above, the United States has been,

4   and may continue to be, severely damaged.

5                                    **COUNT II**

6                   **California False Claims Act, Cal. Gov't Code § 12650, *et seq*.**

7       108.   Relator incorporates by reference the preceding paragraphs of the Complaint as

8   though fully set forth herein.

9       109.   This is a civil action brought by Relator on behalf of the State of California against

10   Defendants under the California False Claims Act, Cal. Gov. Code § 12652(c).

11       110.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

12   the information involved, or with actual knowledge of the falsity of the information, presented, or

13   caused to be presented to, and may still be presenting or causing to be presented to, an officer or

14   employee of the State of California or its political subdivisions, false or fraudulent claims for

15   payment, in violation of Cal. Gov. Code § 12651(a)(1).

16       111.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

17   the information involved, or with actual knowledge of the falsity of the information, made, used

18   or caused to be made or used, and may still be making, using or causing to be made or used, false

19   records or statements to get false or fraudulent claims paid or approved in violation of Cal. Gov.

20   Code § 12651(a)(2).

21       112.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

22   the information involved, or with actual knowledge of the falsity of the information, made, used

23   or caused to be made or used, and may still be making, using or causing to be made or used, false

24   records or statements material to obligations to pay or transmit money or property to the State of

25   California or its political subdivisions in violation of Cal. Gov. Code § 12651(a)(7).

26       113.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

27   the information involved, or with actual knowledge of the falsity of the information, concealed or

28   improperly avoided or decreased, and may still be concealing or improperly avoiding or

1   decreasing, obligations to pay or transmit money or property to the State of California or its

2   political subdivisions in violation of Cal. Gov. Code § 12651(a)(7).

3      114.   The State of California, or its political subdivisions, unaware of the falsity of the

4   claims and/or statements made or caused to be made by Defendants, and in reliance on the

5   accuracy of these claims and/or statements, paid, and may continue to pay, for viscosupplements

6   and related management services for recipients of state and state subdivision-funded health

7   insurance programs.

8      115.   As a result of Defendants' actions as set forth above, the State of California,

9   including its political subdivisions, has been, and may continue to be, severely damaged.

## COUNT III

**State of Nevada Submission of False Claims to State or Local Government Act, Nev. Rev.**

**Stat. § 357.010, *et seq*.**

13     116.   Relator incorporates by reference the preceding paragraphs of the Complaint as

14  though fully set forth herein.

15     117.   This is a civil action brought by Relator on behalf of the State of Nevada against

16  Defendants under the State of Nevada Submission of False Claims to State or Local Government

17  Act, Nev. Rev. Stat. § 357.080(1).

18     118.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

19  the information involved, or with actual knowledge of the falsity of the information, presented or

20  caused to be presented, and may still be presenting or causing to be presented, a false claim for

21  payment or approval, in violation of Nev. Rev. Stat. § 357.040(l)(a).

22     119.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

23  the information involved, or with actual knowledge of the falsity of the information, made, used

24  or caused to be made or used, and may still be making, using or causing to be made or used, false

25  records or statements to obtain payment or approval for false claims in violation of Nev. Rev.

26  Stat. § 357.040(1)(b).

27     120.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of

28  the information involved, or with actual knowledge of the falsity of the information, made, used,

1  or caused to be made or used, and may still be making, using or causing to be made or used, false

2  records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the

3  State of Nevada or one of its political subdivisions, in violation of Nev. Rev. Stat. §

4  357.040(1)(g).

5      121.   The State of Nevada, or its political subdivisions, unaware of the falsity of the

6  claims and/or statements made or caused to be made by Defendants, and in reliance on the

7  accuracy of these claims and/or statements, paid, and may continue to pay, for viscosupplements

8  and related management services for recipients of health insurance programs funded by the state

9  or its political subdivisions.

10      122.   As a result of Defendants' actions, as set forth above, the State of Nevada or its

11  political subdivisions have been, and may continue to be, severely damaged.

12  **VII.   PRAYER FOR RELIEF**

13      WHEREFORE, Relators pray for judgment against Defendants as follows:

14      A.   That Defendants be ordered to cease and desist from submitting any more false

15  claims, or further violating the FCA;

16      B.   That judgment be entered in the United States of America's favor and against

17  Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for

18  in 31 U.S.C. § 3729(a)(1), plus a civil penalty of not less $5,500 or more than $11,000 per claim

19  as provided by 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation

20  Adjustment Act of 1990, to the extent such multiplied penalties shall fairly compensate the

21  United States of America for losses resulting from the various schemes undertaken by

22  Defendants, together with penalties for specific claims to be identified at trial after full discovery;

23      C.   That judgment be entered in California's favor and against Defendants in the

24  amount of each and every false or fraudulent claim, multiplied as provided for by the California

25  False Claims Act, plus civil penalties in the ranges provided by the Act.

26      D.   That judgment be entered in Nevada's favor and against Defendants in the amount

27  of each and every false or fraudulent claim, multiplied as provided for by the Nevada Submission

28  of False Claims to State or Local Government Act, plus civil penalties in the ranges provided by

1   the Act.

2       E.      That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C.

3   § 3730(d), Cal. Gov't Code § 12652(g), and Nev. Rev. Stat. § 357.220;

4       F.      That Defendants be ordered to disgorge all sums by which they have been enriched

5   unjustly by their wrongful conduct;

6       G.      That judgment be granted for Relators against Defendants for all costs, including,

7   but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees incurred by

8   Relators in the prosecution of this suit; and

9       H.      That Relators be granted such other and further relief as the Court deems just and

10  proper.

11                                  **JURY DEMAND**

12      Pursuant to Federal Rule of Civil Procedure 38(b), Relator demands a jury trial for all

13  claims and issues so triable.

14

15  Dated: April 14, 2014                   Respectfully submitted,

16                                          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

17
                                            By: _____
18                                                  Robert J. Nelson

19
                                            Robert J. Nelson (CA 132797)
20                                          rnelson@lchb.com
                                            Nimish R. Desai (CA 244953)
21                                          ndesai@lchb.com
                                            Jerome Mayer-Cantú (CA 291623)
22                                          jmayercantu@lchb.com
                                            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
23                                          275 Battery Street, 29th Floor
                                            San Francisco, CA 94111-3339
24                                          Telephone: 415.956.1000
                                            Facsimile: 415.956.1008
25
                                            *Attorneys for Relator John Roe*
26

27

28

1167644.5                       - 22 -                           COMPLAINT